UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA   )      Criminal No. 04-40028–FDS
)
)
V.                   )
)
)
DONNA FARRELL          )

**DEFENDANT'S SENTENCING MEMORANDUM AS TO 3553 (a) FACTORS**

Donna Farrell,("the Defendant") in the above-numbered Indictment and through Counsel, submits the following Sentencing Memorandum as to 18 U.S.C. 3553 (a) factors.

Some months subsequent to the Defendant's Sentencing Memorandum, the First Circuit decided United States v. Jimenez-Beltre, 440 F.3d 514 (1st Cir. 2006), establishing a sentencing protocol – as clearly as can be possible – in the aftermath of United States v. Booker, 543 U.S. 220, 125 S.Ct. 738 (2005).

The beginning of the Court's opinion makes it unambiguous that 'reasonableness' is the touchstone of post-Booker sentencing.[1]  Hand-in-glove with that precept, the Court found that the United States Sentencing Guidelines were not "presumptively controlling," and that a Guidelines sentence was *not* "per se reasonable."  440 F.3d 518.   Although the Guidelines are not simply 'another factor' in the process of disposition, "…[they] are still *generalizations*." *Id*., emphasis in original.

"*Booker's* remedial solution makes it possible for courts to impose non-guideline sentences that override the guidelines, subject only to the ultimate requirement of

---

[1]   "[S]entences would be reviewable for reasonableness whether they fell within or without the guidelines." Jimenez-Beltre, at 440 F.3d 517.

1

reasonableness." *Id*.

The holding in Booker has permitted the statutory sentencing mandates of 18 U.S.C. §3553 to emerge with new vitality and prominence, where they were, pre-Booker, effectively trumped. Or at least in part neutralized. Indeed, in his concurring Opinion, Judge Torruella states unequivocally:

> Finally, I think it is of *critical importance* that the majority opinion be understood to reinforce our commitment to the statutory requirement that, *in all cases*, district courts must impose sentences that are 'sufficient, but not greater than necessary' to effectuate the goals of criminal punishment, as articulated in 18 U.S.C. § 3553(a). In articulating its reasons for imposing any sentence, the district court must make clear reference to this *central principle*.

*Id*., at 440 F.3d 521, emphasis supplied.

In *his* Concurring Opinion, Judge Howard put an even point on it:

> The so-called 'parsimony' provision, which requires that sentences be only as long as necessary to serve the purposes listed in section 3553(a)(2), has received scant attention from courts. Commentators note that this provision '…is not just another "factor" to be considered along with others set forth in Section 3553(a)… -- it sets an independent limit on the sentence a court may impose.'

*Id*., at 440 F.3d 526, citations omitted. Judge Howard also observed that the 'parsimony' provision is the lead-off language in §3553. It is a charter clause, governing those sentencing provisions which follow it.

The defendant in this case was charged in a one count indictment charging Theft of Government Property, in violation of 18 U.S.C. Sec 641 arising out of cashing her dead mother-in-law's social security checks. Although the total amount of money overpaid was $75,863.00 $10,067.21 was recovered by the Social Security Administration by withdrawing those funds

2

from the account.

As stated in the Pre Sentence Report, the Probation Department has scored the defendant's Guideline level at 10, however, the defense has filed an objection to that score and due to the fact that the projected loss was under Seventy-Thousand Dollars ($70,000.00) argued that the defendant's correct Guideline score should be a level 9 with a Criminal History Category I. If the Court were to agree with the defendant's position that this were accurate based upon the facts that were put forth, the defendant's ultimate exposure would be 0 to 6 months. In the context of requesting the court to exercise its discretion pursuant to 18 U.S.C. 3553 (a), the defendant contends that Level 9 is the appropriate level at which to sentence the defendant, 0 months in prison, probation with an order of full restitution.

The defendant's personal history is comprehensively stated in the presentence report prepared by probation. At this juncture the defendant's intention is to highlight those factors in the defendant's personal background coupled with her conduct in this matter in the hopes of persuading this court to accept the defendant's sentencing recommendation. Additionally, the defendant wishes to point out that, although the government has never said that it would or is adopting the defendant's sentencing recommendation, it has represented to me that its recommendation would be a sentence that did not involve incarceration.

Mrs. Farrell was married to her recently deceased husband, Michael Farrell, at the age of nineteen. She grew up in a military family resulting in approximately nineteen moves throughout her childhood and adolescent years. According to the defendant, she was the product of an alcoholic home and suffered physical abuse from her alcoholic father and sexual abuse from her older brother. Although a product of an alcoholic home neither she nor her deceased husband had any alcohol or drug abuse issues.

After marrying Michael, who became a Marlborough Police Officer at the time or shortly thereafter their marriage, the couple unsuccessfully tried to have children. Believing that they were barren, the couple endeavored to foster children and she, primarily, and her husband began fostering children and continued to do so up to 2001. Over the years the defendant fostered over two hundred children, many of whom she has remained in contact with over the years. (Although the couple originally had trouble producing their own children, they eventually produced three offspring.)

The conviction at issue here is the result of the misappropriation of Social Security benefits belonging to the defendant's mother in law, Gloria Dennis, after her Ms Dennis' death in 1995. Some time prior to the death of Ms. Dennis, she opened a joint account with the defendant who was caring for her at the time. After Ms. Dennis' death, the defendant originally thought that the funeral home who buried Ms. Dennis had contacted Social Security to inform the administration of Ms. Dennis' death, however, whether that actually happened is still unclear and the monthly funds continued to be deposited in the joint account of Ms. Dennis and the defendant. Regardless, it became apparent that at some time thereafter the defendant became aware that the funds had not been shut off and misappropriated the monies in question to which she has unequivocally plead guilty and accepts responsibility.

Although, without more the defendant's actions can clearly be characterized as an outright theft of government funds, there were pressures and events occurring in the defendant's life over the years from 1995 though 2001 and thereafter which suggest that sentencing the defendant in accordance with a United States Guideline Level of 10 is excessive pursuant to the standards of 18 U.S.C. 3553 (a) and that the next lowest guideline of 9 is more appropriate under the circumstances.

The defendant, in addition to her other obligations of raising her children and administering foster care, undertook the care of her mother-in-law Gloria Dennis in the summer of 1993. This care included transportation to doctors, chemo therapy and home care. This intensified as Gloria Dennis' condition worsened during the period of April 1995 through August 1995, the month of her death. Ms. Dennis moved into the Farrell family home and due to her illness created even more pressures and disruption of the family unit. The children living in the home ranged in age from eight to eighteen. Shortly after the death of Ms. Dennis, in September of 1995, the defendant's Lupus became even more active necessitating Mrs. Farrell's discontinuation of foster care which also reduced the family income as well as confining her mostly to home and bed. Although not burdened by her fostercare duties, she still had children living in the house who needed parental guidance and support. Due to her diminished physical condition, she was unable to provide this care. Her lupus remained in an exacerbated state until in and around February of 1996.

On or about November 1995 the defendant's husband was stricken with serious angina and put on administrative leave by the Whitman Police Department. According to the defendant, in addition to the immense personal pressure of two parents who were at the very least partially disabled, the family income was reduced roughly another twenty five per cent. Mr. Farrell was out of work for approximately four months and during that time underwent surgical procedures for the insertion of two stints and also cardiac rehabilitation. On or about February of 1996 he returned to work as a police officer and approximately six months later in late 1996 Mr. Farrell had an actual heart attack which caused him to be out of work for approximately another four months during which time he had a heart bypass and the insertion of an additional third stint. He again tried to resume his career as a police officer in 1997 and lasted no more than a week when

he had to retire on a disability.

While all this was going on the defendant's mother's husband was suffering with pancreatic cancer and when her mother was diagnosed with uterine cancer towards the end of 1995, the defendant took them in to live with her and the family. They lived there for a period of six months. After the defendant's parents moved out of the family home, the defendant's mother's husband cancer progressed to his brain resulting in uncharacteristic violent and abusive behavior in 1997 requiring Mrs. Farrell's involvement in assisting her mother in obtaining a restraining order and removal of her mother's husband from the mother's home.

The defendant's lupus condition can best be characterized as up and down. She is able to function when it has not flared up, but when a episode occurs she is often incapacitated so that she cannot work and is often housebound. These episodes generally last for two weeks to three months. The defendant is always on some level of medication for her Lupus, more when there is a flare up but a maintenance dose at all other times. These medications include Prednizone, Tolmentin, Azathioprine and Trazadone. In addition to the defendant's Lupus condition the defendant was diagnosed with diabetes in 1999 and prescribed Glucophage. The defendant was able to discontinue the use of Glucophage for the treatment of her diabetes after losing seventy five pounds.

Although the defendant was able to resume foster care in February of 1996, it was on a limited basis due to her health and other conditions related to her husband's health and stressful family situation. Ultimately the defendant discontinued foster care permanently in 2001 for all of the same reasons.

In April of 2000, the defendant's mother passed away and in May the defendant, her husband and children took a trip across country in an older camper that was owned by the family.

6

Although this conduct may appear frivolous under the circumstances, the defendant and her family were overwrought with the stresses and disappointments of the previous several years requiring a physical and psychological recuperation in order to resume tackling their responsibilities in life. Indicative of the defendant's purpose of paying the money back to Social Security, no withdrawals from the bank occurred after January 2000, five months before their trip. This coupled with the expectation of receiving a sizable amount of money from the defendant's mother's estate sometime in June of 2000, approximately $50,000.00, influenced them to believe that they could take this trip, recharge their physical and emotional strength, resume new careers and return and pay back a significant portion of the monies owed to Social Security. This plan was foiled by even more bad luck when their camper broke down in South Dakota necessitating the purchase of a newer model as well as additional and unexpected bills and obligations thus reducing their capacity to pay the monies back to Social Security as they had originally planned. They did, however, stick to the plan of returning the monies as is evidenced by no further withdrawals on the joint bank account of Ms. Dennis and the defendant. ( For purposes of illustration as to the 3553 (a) issues, the defendant's objection to the presentence report is attached hereto as Exhibit A)

     In November of 2001 the monies deposited by Social Security since February of 2001 were returned by the bank and the defendant became aware of this event. In March of 2002 the defendant was visited and interviewed by the Inspector General's Office with whom she fully cooperated and gave a statement to admitting her appropriation of the funds and realizing that she would have to pay them back. After this time the defendant awaited hearing from the Social Security Administration but was eventually indicted.

     In April of this year, after trying to become reemployed as a tractor trailer driver, so as to

7

assist in the restitution of the funds in issue, the defendant's husband died while working. He had only been working several weeks after graduating from tractor trailer school in Pennsylvania. At this time, the defendant is the sole bread winner in the home with death benefits from her husband's former employer, the Commonwealth of Masssachusetts.

At home living with the defendant are three of her children , Michael age 19, Joshua age 18 and Dawn-Marie age 15. All three children are enrolled in school and will be living at home for the next four to six years. All are reliant upon their mother both emotionally and financially, especially in light of the recent death of their father. The defendant is currently out of work due to a motorcycle accident where she broke her leg and is expected to be out of work for at least the next two months.

In determining the imposition of a sentence pursuant to 18 U.S.C. 3553 (a) in this case the defendant asks the Court to evaluate not only those factors which make up the defendant's Guideline Score but to evaluate her life as a whole including, not only the crime committed, but the nature of the defendant based upon the life she has lived thus far aside from her criminal conduct in this matter. Under no circumstances is the defendant arguing that her unfortunate life circumstances should exonerate her for this crime, however, in light of those circumstances coupled with her crime free life and her otherwise exemplary contribution to society strongly suggests a punishment short of confinement.

The nature and circumstances of this offense demonstrate , for lack of a better explanation, a sliding scale of culpability where the defendant when coming upon this unexpected money was confronted with financial problems, family health and personal issues and chose to stick her head in the sand, temporarily use the money and think about the problem tomorrow. The real problem was that the tomorrows built up and like the road to damnation, her

conduct was paved with good intentions without the appropriate action upon those intentions. It is unfortunate that when confronted with the temptation of these funds that she and her family were in financial straits and future economic uncertainty. If the defendant enjoys the benefit of the doubt in this case, her history of giving to and taking care of others establishes that it is more likely than not that she would have lived her life crime free.

    Imposing a sentence here below the guidelines requiring confinement does not send a message to the public that this offense is not considered serious. The defendant will have a felony record for life and all the limitations that accompany that status. Additionally, she will be on probation for a significant period of time requiring her to work very hard to return the money taken with interest. This unfortunately will have a deleterious effect on her children for which she will have to bear the moral and emotional responsibility. This, it is suggested to this Court is more than sufficient to send the message of seriousness and deterrence.

    In conclusion, the defendant is extremely sorry and embarrassed for her conduct and if her future is anything like her past that is separate and distinct from her crime, the defendant will go on to live a life that contributes and assists society as she has done in the past.

DATED: 9/6/06

    By his attorney,

'/s/Walter H. Underhill, Esquire'
Walter H. Underhill, Esq.
66 Long Wharf
Boston, MA
02110
4th. Floor
Tel. # 617-523-5858
B.B.O. # 506300

CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

SIGNED:   '/s/Walter H. Underhill, Esquire'
          WALTER H. UNDERHILL, ESQ.

DATE:     September 6, 2006

RULE 7.1 CERTIFICATION

The parties have had an opportunity to confer on this motion and the motion is assented to by the attorney for the Government Donald Cabel, Esquire.

SIGNED:   '/s/Walter H. Underhill, Esquire'

DATE:     September 6, 2006

# 3553 (A) MEMORANDUM – EXHIBIT A

## *LAW OFFICES OF WALTER H. UNDERHILL*
*66 LONG WHARF*
*BOSTON, MASSACHUSETTS*

*Telephone: (617) 523-5858*
*Facsimile:(617)523-7834*

August 30, 2006

United States Department of Probation
595 Main Street
Worcester, MA
01608
ATTN: Kelly Foster


**RE:    UNITED STATES v. DONNA FARRELL**
        **Case No.:    04 CR 40028**
        **OBJECTIONS TO PRESENTENCE REPORT**


Dear Ms. Foster,


Please find enclosed the defendant's objections to the Presentence Report.

OBJECTION #1 – PARAGRAPH # 20 and 26


The Probation Department in its Guideline calculations places the defendant at a Level 10. The basis for this level, as opposed to a Level 9, is that pursuant to USSG Sec. 2B1.1 (I), the intended loss was over $70,000 and less than $120,000. The defendant submits that Level 9 was the appropriate level because the intended amount of loss was more than $40,000 and less than $70,000 which places the defendant at a Level 9 pursuant to USSG Secs. 2B1.1 and 2B1.1 (H).

The pattern of the offense conduct in this case was that the defendant co mingled her funds with the funds that the Social Security Administration deposited into her account. The defendant routinely withdrew money from the account over the four plus years in question. In February of 2001, however, her mother died and the defendant knew that she would be receiving monies from the estate. At this point, the defendant, although knowing she was inappropriately taking the funds, stopped and planned to pay back to the Social Security Administration the funds that she had misappropriated with the funds

that she was receiving from her mother's estate. Therefore the defendant did not intend any further loss beyond the $66,703.00 amount.

The defendant contends that the intended loss of under $70,000 is supported by the bank statements from the bank at issue. Those statements, provided to the defense by the Government, span the years 1995 to November 2001. The bank statements from February 2001 until November 2001 reveal that Social Security deposits were made , but no withdrawals were made on that account until November 2001 when the Social Security Administration took all the remaining funds from the account to recover as much of the $75,863 that was overpaid into that account. The deposits made during the period February 1, 2001 until November 2001 total $9160.00. $75,863.00 minus $9160.00.is $66,703.00 which brings the defendant down one additional level to Level 9.

Below are the figures represented on the bank records referred to above.

| DATE | DEPOSIT | WITHDRAWAL | BALANCE |
|---|---|---|---|
| 2/10/2001 | $1,145.00 | $0.00 | $4,278.83 |
| 3/10/2001 | $1,145.00 | $0.00 | $5,422.45 |
| 4/10/2001 | $1,145.00 | $0.00 | $6,572.19 |
| 5/10/2001 | $1,145.00 | $0.00 | $7,720.06 |
| 6/9/2001 | $1,145.00 | $0.00 | $8,868.42 |
| 7/10/2001 | $1,145.00 | $0.00 | $10,017.37 |
| 8/10/2001 | $1,145.00 | $0.00 | $10,059.70 |
| 9/10/2001 | $1,145.00 | $0.00 | $10,063.86 |
| 10/10/2001 | $0.00 | $0.00 | $10,067.21 |
| 11/10/2001 | $0.00 | $0.00 | $0.00 |
|  | $9,160.00 | $0.00 |  |

Thank you very much for your cooperation and assistance in this matter. Should you have any questions, please contact me at your earliest convenience.

Very truly yours,

_____
Walter H. Underhill, Esquire